**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| GLOBAL TEL*LINK CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:14-CV-00829-K |
| | § | |
| SECURUS TECHNOLOGIES, INC. | § | **ECF** |
| | § | |
| *Defendant*. | § | |
| | § | |

**PLAINTIFF GLOBAL TEL*LINK CORPORATION'S**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

I.         Introduction and Background ................................................................................. 1

II.        Legal Authority ..................................................................................................... 2

III.       Construction of Disputed Claim Terms ................................................................ 3

   A.    The '732 Patent ..................................................................................................... 3

      1.   "streaming converter" ...................................................................................... 3

      2.   "a first telephone instrument . . . configured for communications with a second
          telephone instrument located at a second location" ...................................... 5

      3.   "coupled to"; "coupled between"; and "selectively coupled to" ..................... 6

      4.   "a workstation . . . configured to access recorded inmate conversation data stored in
          said device" ..................................................................................................... 8

      5.   "ongoing conversation[s]" ............................................................................... 9

   B.    The '021 Patent ..................................................................................................... 9

      1.   "routing means" and "at least one routing means coupled to said telephone terminal and
          said central platform" ...................................................................................... 9

      2.   "one or more apparatuses digitizes audio and stores said audio for caller identification
          at said institution"; "one or more apparatuses digitizes audio regarding said
          conversation and stores said audio for caller identification at said institution"; and
          "central platform digitizes audio regarding said conversation and stores said audio
          for caller identification at an institution associated with said local user" ................ 12

      3.   "coupled to" ..................................................................................................... 14

      4.   "further wherein said central platform comprises one or more apparatuses for
          processing said telephone call"; "further wherein said central platform includes one
          or more apparatuses for-processing said telephone call"; and "a central platform for
          processing said telephone call" ....................................................................... 15

      5.   "wherein said local user is only granted access to place a telephone call if an
          authentication means verifies identification information as indicative of a valid user"
          ....................................................................................................................... 17

   C.    The '243 and '736 Patents ................................................................................... 19

      1.   "voice print" ..................................................................................................... 19

      2.   "matching said first and second identification numbers" and "if said second voice print
          matches said first voice print" ........................................................................ 22

      3.   "costs of conversations by said local user" ..................................................... 24

IV.       Conclusion ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)..............2

*Adv. Software Design Corp. v. Fiserv, Inc.*, 625 F. Supp. 2d 815 (E.D. Mo. 2008) ...................22

*Am. Patent Dev., Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704 (D. Del. 2009) ..........................9

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014) ...................................................3, 15

*Bd. of Regents of the Univ. of Tex. Sys. v. BenQ Am. Corp.*, No. A-05-CA-181-SS,
    2006 WL 6112210 (W.D. Tex. July 14, 2006) ...................................................................24

*Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, No. 07-cv-0894, 2008 WL
    4951984 (S.D. Cal. June 2, 2008).................................................................................. 22-23

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013)...........................2

*Encap LLC v. Oldcastle Retail Inc.*, No. 11-C-808, 2012 WL 2339095 (E.D. Wis.
    June 19, 2012) .......................................................................................................................17

*Innovative Sonic Ltd. v. Research In Motion Ltd.*, No. 3:11-CV-0706-K, 2012 WL
    4928897 (N.D. Tex. Oct. 17, 2012) .......................................................................................2

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350
    (Fed. Cir. 2011).................................................................................................................3, 16

*Konami Corp. v. Roxor Games, Inc.*, 445 F. Supp. 2d 725 (E.D. Tex. 2006) .............................23

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)...........................................4

*MEMS Tech. Berhad v. ITC*, 447 F. App'x 142 (Fed. Cir. 2011).....................................................7

*Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) .....................................3, 17

*Osram GmbH v. ITC*, 505 F.3d 1351 (Fed. Cir. 2007).................................................................25

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..........................................................2, 22

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294 (Fed. Cir. 1999)...........................................10

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278 (Fed. Cir. 2005) ...................................14

*Silicon Graphics, Inc. v. n Vidia Corp.*, 58 F. Supp. 2d 331 (D. Del. 1999)..................................7

*Silicon Image, Inc. v. Genesis Microchip, Inc.*, No. 3:01cv266, 2002 U.S. Dist. LEXIS 28916 (E.D. Va. Dec. 10, 2002) ........................................................................7

*Smith v. United States*, 114 Fed. Cl. 428 (Ct. Cl. 2013) .............................................24

*Stanacard, LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483 (S.D.N.Y. 2010) ..........5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) .........................4

*U.S. Gypsum Co. v. LaFarge N. Am. Inc.*, No. 03-C-6027, 2009 WL 3720032 (N.D. Ill. Nov. 2, 2009) ................................................................................20

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .........................14

*Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, No. 1:05-CV-00955, 2011 WL 6934603 (M.D.N.C. Dec. 30, 2011) ................................................22

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225 (Fed. Cir. 2001) ................................................................................11, 17, 19

**STATUTES**

35 U.S.C. § 112(f) ................................................................................2, 3, 10, 15, 16, 17, 18, 19

I.      **Introduction and Background**

Global Tel*Link Corporation ("GTL") and Securus Technologies, Inc. ("Securus"),

compete in providing telecommunications services and equipment to correctional facilities.  Due

to the security demands of the prison environment and the needs of correctional and law

enforcement personnel, these telecommunications systems incorporate features not found in

residential or business settings.  For example, prison officials can control which inmates are

allowed to initiate a telephone call, verify the identity of the inmate placing a telephone call,

prevent the caller from reaching blocked telephone numbers (for instance, those of known gang

members), monitor ongoing conversations, review recordings of past calls, use call data and

recordings of telephone calls to investigate illegal activities, and track each inmate's usage so as

to appropriately bill for calls.  GTL has been a leader in developing this technology and has

received numerous patents resulting from its work, including the four patents at issue in this

case:  U.S. Patent Nos. 7,551,732 ("the '732 patent"), 7,783,021 ("the '021 patent"), 7,853,243

("the '243 patent"), and 8,509,736 ("the '736 patent").

For the most part, these patents do not use highly technical language or terms of art that

would be difficult for a lay jury to understand.  Even where some interpretation of the claim

terms is necessary, the patents themselves clearly define the terms.  Yet Securus proposes to

construe a large number of terms, and it presents complicated interpretations that do nothing to

clarify the terms' meanings and instead introduce ambiguity.  Securus has strayed from the

patents' intrinsic evidence and tries to impose its own preferred meanings or limitations on the

claim language, in an effort to aid its own non-infringement and invalidity theories, not to help

the jury or this Court.  The Court should reject Securus's proposals and should give the claim

terms their plain and ordinary meanings, in line with the descriptions of the inventions found within the patents themselves.

## II.    Legal Authority

When construing patent claims, courts must give claim language its "ordinary and customary meaning" as understood by one of ordinary skill in the art at the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). In discerning this meaning, courts look primarily to the words of claims themselves, the remainder of the specification, and the prosecution history. When considering these sources, courts may not read into the claims a limitation from the specification. *See, e.g., id.* at 1320, 1323; *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013).

This Court has declined to construe certain terms "beyond [their] plain and ordinary meaning" and "presented [terms] to the jury as [they are] written in the patent claims" when, for example, the term is "readily understandable to a jury." *Innovative Sonic Ltd. v. Research In Motion Ltd.*, No. 3:11-CV-0706-K, 2012 WL 4928897, at *11 (N.D. Tex. Oct. 17, 2012) (Kinkeade, J.); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (affirming that phrases "have plain meanings that do not require additional construction"). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314.

Where, as here, a party asserts that § 112(f) applies, the Court must determine whether the claim limitation is expressed as "a means or step for performing a specified function without the recital of structure, material, or acts in support thereof" and, if so, construe that limitation "to cover the corresponding structure, material, or acts described in the specification and equivalents

thereof." 35 U.S.C. § 112(f).[1]  In making this inquiry, courts must "focus[] on the claim terms

the patentee chose" and should take care not "to rewrite a claim in means-plus-function format."

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1297-98 (Fed. Cir. 2014).  Thus, when "the claim

language does not recite the term 'means,' [the court] presume[s] that the limitation does not

invoke § 112[f]." *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356

(Fed. Cir. 2011).  If a court determines a claim limitation invokes § 112(f), it must identify the

claimed function and corresponding structure for performing that function in the specification.

*See Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).

## III.   Construction of Disputed Claim Terms

### A.   The '732 Patent

The '732 patent discloses an efficient way to record and store audio and related

information from prison telephone conversations at a central location that is remote from both

the prison and the location of the called party.  *See* '732 patent Abstract.  The patent uses an

analog-to-digital converter to change the analog voice data into digital format; the digital voice

data can then be transported to a remote storage location during an inmate's telephone call.  Calls

can also be monitored or replayed through a workstation with access to the system.

### 1.   *"streaming converter"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "streaming converter" | 8, 10, 15 | "hardware and/or software that converts compressed voice data into a streaming format" | "a device that converts compressed voice data on the fly into a standard Windows '.wav' format without waiting for the entire voice data file to download" |

---

[1] Before the America Invents Act, Pub. L. No. 112-29, title 35 U.S.C. § 112(f) was codified as 35 U.S.C. § 112, sixth paragraph.  No substantive change in the law was made when the subheading (f) was added.

In several claims of the '732 patent, the audio recording and monitoring system includes a "streaming converter" connected to the audio storage location and to a workstation where telephone conversations can be monitored.  The streaming converter is depicted in Figure 2 of the patent as element **230**, the "Digital Data/Voice Converter (streaming converter)."  As the specification explains, when a workstation operator chooses to listen to a recorded conversation, "the selected compressed data is passed from storage device **220** to the digital data/voice converter **230** which converts the compressed voice data into a 'streaming' format and passes the converted voice data back out" to the workstation that requested it.  '732 patent 8:2-8.  GTL's construction tracks this description; the "streaming converter" is "hardware and/or software that converts compressed voice data into a streaming format."

Securus, however, proposes to limit the streaming converter to one specific embodiment disclosed in the patent:  a device that converts compressed voice data "on the fly into a standard Windows '.wav' format" without "waiting for the entire [voice data] file to download" before the workstation operator can begin to review it.  *Id.* 6:49-53.  The introduction of the phrase "on the fly" is overly colloquial and unhelpful to the jury.  Moreover, this is only one exemplary type of streaming converter and one particular file format.  The claim language itself is not so limited.  And the Federal Circuit has repeatedly explained that it is improper to limit claims to a preferred embodiment—even when that embodiment is the only one disclosed in the specification—unless the patent "us[es] words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

. . . .").  The '732 patent contains no such exclusion or restriction; instead, it contemplates any

"'streaming' format."  '732 patent 8:5.  Securus's proposed construction, therefore, represents a

naked attempt to avoid infringement by limiting the converter to one particular sound file format

(.wav) that Securus's accused system may not use.  The Court should reject this ploy.

2.   *"a first telephone instrument . . . configured for communications with a second telephone instrument located at a second location"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "a first telephone instrument. . . configured for communications with a second telephone instrument located at a second location" | 1, 8, 20 | No construction required.<br><br>To the extent the Court believes construction is required: "a telephone located within a prison that can send and receive voice audio to and from a telephone outside the prison" | "an originating telephony device comprising hardware and software arranged to communicate with a distantly located destination telephony device" |

Several claims of the '732 patent recite "a first telephone instrument" that is "configured

for communications with a second telephone instrument located at a second location."  Lay

jurors can easily understand this term:  it means there is one telephone that is able to

communicate with a second telephone at a different place.  There is no need for further

construction.  It would be particularly inappropriate to adopt Securus's convoluted construction,

which replaces easily understood words such as "telephone instrument" with more complicated

words like "telephony device," and which adds concepts (like the inclusion of "hardware and

software") that are not in the patent.  *See, e.g., Stanacard, LLC v. Rebtel Networks, AB*, 680

F. Supp. 2d 483, 493 (S.D.N.Y. 2010) ("Rebtel's proposed definition [of 'telephone number']

serves only to introduce additional terms into the claim and would result in confusion for the

jury.").  Nor is there any reason to limit the first telephone to "originating" rather than receiving

calls, as Securus proposes to do.  If the Court believes any construction is necessary, it should

adopt GTL's proposal, which reflects the meaning of the phrase as used in the '732 patent.

3.  *"coupled to"; "coupled between"; and "selectively coupled to"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "coupled to" | 1, 5, 6, 8, 15, 20, 22, 23 | No construction required.<br><br>To the extent the Court believes construction is required: "connected to" | "permanently connected directly to" |
| "coupled between" | 2 | No construction required.<br><br>To the extent the Court believes construction is required: "connected between" | "permanently connected directly to both" |
| "selectively coupled to" | 10 | No construction required.<br><br>To the extent the Court believes construction is required: "selectively connected to" | "when chosen by workstation operator temporarily connected directly to" |

A number of claim terms in the '732 patent require that one thing be "coupled to" or

"selectively coupled to" another thing.  Here again, a jury can comprehend the words of the

claim without further elaboration.  If any construction is required, it would only be to explain to

the jury what they presumably already know:  that "coupled" is synonymous with "connected."

Securus, however, wants to impose the additional requirement that "coupled" means the

connection must be both "permanent" and "direct."  The '732 patent imposes no such

requirement; indeed, the claims preclude such a construction.  Claim 1, for example, recites an

analog to digital converter that is located at a first location and is coupled *both* to a telephone

instrument at that first location *and* to a data storage device at a "physically remote" third

location.  '732 patent 8:45-53.  If "coupled" were construed to require a direct, permanent

connection, the analog to digital converter could not possibly be "coupled to" different devices at two physically remote locations, and the claim would be meaningless.  Likewise, it is impossible to square Securus's proposed construction with the patent's recitation of things that are "coupled" to each other through such large, far-reaching networks as the Internet, other wide area networks, or the public switched telephone network ("PSTN").  *See id.* 5:40-45; 9:47-51 (cls. 13, 14).  When two telephones in different states are connected through the numerous lines and switches that make up the PSTN, the resulting connection is neither "direct" nor "permanent."

As other courts have recognized, "common usage of the term 'couple' supports both direct and indirect connections," and that common usage should not be limited without "clear language" in the claims or specification supporting a disavowal of claim scope.  *Silicon Image, Inc. v. Genesis Microchip, Inc.*, No. 3:01cv266, 2002 U.S. Dist. LEXIS 28916, at *88-89 (E.D. Va. Dec. 10, 2002); *see also MEMS Tech. Berhad v. ITC*, 447 F. App'x 142, 152 (Fed. Cir. 2011) ("Nowhere in the specification is the claimed electrical coupling described as 'direct,' and nothing in the claim language or specification suggests that 'electrically coupled' should have any interpretation other than its plain meaning."); *see also Silicon Graphics, Inc. v. n Vidia Corp.*, 58 F. Supp. 2d 331, 346 (D. Del. 1999) ("The court finds no reason not to apply the ordinary meaning of the term 'couple,' and determines that the ordinary meaning in this context is 'coupled or connected, directly or indirectly.'").  The '732 patent contains no language that would limit the term "coupled" to mean only direct or permanent connections.

Nor does the patent provide any basis to limit the term "selectively coupled" to require that the streaming converter be connected to the output of the analog to digital converter only "when chosen by [a] workstation operator."  Claim 10 does not require an operator to make the

recited selection. The patent describes a workstation operator choosing whether to listen to pre-recorded conversation audio or to monitor an ongoing call—a choice that will affect whether audio is streamed from the data storage device or from the analog to digital converter. *See, e.g.*, '732 patent 8:2-4. But that does not mean the workstation operator must actually select the connection of those components. Nor does the patent say anything about that connection being "temporary." Securus's proposed construction is groundless and should be rejected.

4. *"a workstation . . . configured to access recorded inmate conversation data stored in said device"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "a workstation . . . configured to access recorded inmate conversation data stored in said device" | 4, 23 | No construction required. | "a powerful, high-speed personal computer comprising hardware and software arranged to access recorded inmate conversation data stored in said storage device" |

Securus wants to replace the term "workstation" with a longer, more complicated phrase that introduces jargon like "comprising" as well as unnecessary ambiguity—for example, how fast a computer must be to be considered "high-speed." The Court should reject this construction because it is incorrect and is more likely to confuse the jury than to help them.

Securus's construction is at odds with the patent's description of the workstation. The workstation recited in claims 4 and 23 is coupled to the data storage device located at the central data center. *See* '732 patent 8:50-51, 8:66-9:3, 10:24-25, 10:40-44. That workstation is depicted as terminal 210 in figure 2 of the patent. *See id.* 4:27-28, 7:28-31. And the patent explains: "Terminal **210** is *illustratively* shown as a personal computer, however, such is purely for illustration as the terminal **210** may be embodied as a personal computer, minicomputer or

mainframe computer . . . *or in any other form as may be desired or necessary.*" *Id.* 7:39-44

(emphases added).  Securus's attempt to limit the workstation to a "personal computer"

contradicts the patent specification and should be rejected.

> 5. *"ongoing conversation[s]"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "ongoing conversation[s]" | 6, 10 | No construction required. | "[a real-time conversation/ real-time conversations] that [is/are] actually in process" |

Again, Securus wants to take an easily understood claim term and replace it with a longer

term that does not help the jury understand the scope of the claims.  Lay jurors know what an

"ongoing conversation" is, particularly in the context of telephone calls.  The Court should reject

Securus's proposed construction because it is "merely a verbose paraphrasing of the claim

language," *Am. Patent Dev., Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704, 716 (D. Del. 2009).

## B. The '021 Patent

The '021 patent "discloses a centralized, digital, computer-based telephone call

management system for authenticating users of a telephone system in an institutional facility."

'021 patent Abstract.  In some embodiments, the central platform is located offsite from a

correctional facility, while in others the central platform is onsite.  *Compare, e.g.*, cl. 1 (offsite)

*with* cl. 20 (onsite).  Either way, the platform provides the ability to, for example, control

outgoing telephone communications, authenticate users of the system, monitor conversations

without detection, record and store audio from the conversations, and appropriately bill for calls.

> 1. *"routing means" and "at least one routing means coupled to said telephone terminal and said central platform"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "routing means" | 1 | "router" | Securus contends that this claim |

| "at least one routing means coupled to said telephone terminal and said central platform" | | "at least one router coupled to said telephone terminal and said central platform"<br><br>If the Court construes this phrase to be subject to 35 U.S.C. § 112(f), GTL identifies the function and corresponding structures as follows:<br><br>Function:<br>"routing calls placed by users of the system through the platform to an outgoing trunk"<br><br>Corresponding Structure:<br>"Routers 121a-n of Figure 1; routing means integrated with Platform 102 of Figure 2; routers 213a-n of Figure 3; or router 221 of Figure 4" | term is governed by 35 U.S.C. § 112(f) as it is written in a means-plus-function format, and that the claim limitation should be construed as follows:<br><br>Function:<br>"for routing a telephone call from said telephone terminal to said central platform"<br><br>Corresponding Structure:<br>1. "A router located onsite at an institutional facility, a communication link connecting the router to said telephone terminal, and a communication link connecting the router to said central platform over a PSTN" (Specification, Col. 15:59-16:32; FIG. 1); or<br>2. A gateway located onsite at an institutional facility comprising a router ("gateway router"), and a communication link connecting the gateway router to said telephone terminal, and a communication link connecting the gateway router to said central platform over a VOIP Frame Relay (Specification, Col. 18:1-30; FIG. 3) |

Claim 1 recites "at least one routing means coupled to [a] telephone terminal and [the] central platform." '021 patent 18:66-67. Securus argues that the claim's use of the term "routing means" is an invocation of § 112(f) and that the term must therefore be construed as a means-plus-function limitation. But "even if [a] claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112[(f)] does not apply." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). To a person of ordinary skill in the art, a "routing means" in a claim about telecommunications systems signifies a router.

Even if Securus's legal argument were correct, however, its proposed construction is not. First, Securus is wrong about the function of the claimed "routing means." That function is, quite naturally, to route calls. GTL's proposal comes directly from the patent specification, which states that "[c]alls placed by users of the system are routed through the platform and connected to the proper outgoing trunk based on the type of call placed." *Id.* 9:48-50. Securus wants to limit the routing means' function to only a portion of that description: routing the calls *to* the platform, but not *through* it. That argument finds no support in the patent and violates the doctrine of claim differentiation. "[E]ach claim in a patent is presumptively different in scope," and that presumption is particularly strong "when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (rejecting proposed function for means-plus-function term that would violate doctrine of claim differentiation). Here, the only meaningful difference between independent claim 1 and dependent claim 2 is that, in the latter, the "routing means routes attempted telephonic communication to [the] central platform." '021 patent 19:15-17. Securus's proposal to limit the function of the "routing means" in claim 1 to "routing a telephone call from [a] telephone terminal to [the] central platform" would obliterate any distinction between claims 1 and 2 and therefore violate the doctrine of claim differentiation.

Securus is also wrong about the structure corresponding to the routing function. The patent depicts the routing means as routers, which may be located onsite at a correctional facility or with the offsite centralized platform (or both). *See, e.g.*, '021 patent Fig. 1 & 15:62-63 ("[t]he central call management platform **101** connects to routers **121***a-n* at sites **107***a-n*"), Fig. 3 & 18:4-5 ("Central site 215 contains routers **213***a-n*"). GTL proposes that those routers are the

structure corresponding to the routing means.  Securus, however, proposes to limit the

corresponding structure to *onsite* routers only—contrary to Figure 3 of the patent.  At the same

time, Securus wants to improperly expand the corresponding structure to include a device that is

not a router at all:  the "gateway **205***a*" depicted in Figure 3 and described in the specification at

column 18, lines 14-30.  But, as the specification makes clear, the gateway is separate from the

router; it is not itself a router, but rather "connects to router **213***a* via connection **207***a*," which is

"preferably a VOIP Frame Relay."  '021 patent 18:21-23.  It makes no sense to construe the

"routing means" to include a structure that plainly can be separate from the router described in

the patent.[2]  Securus's proposed corresponding structure is an apparent attempt to broaden the

scope of the claim so that prior art references describing gateways (but not routers) will become

more relevant to the case.  The Court should reject such gamesmanship.

> 2.  *"one or more apparatuses digitizes audio and stores said audio for caller identification at said institution"; "one or more apparatuses digitizes audio regarding said conversation and stores said audio for caller identification at said institution"; and "central platform digitizes audio regarding said conversation and stores said audio for caller identification at an institution associated with said local user"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "one or more apparatuses digitizes audio and stores said audio for caller identification at said institution" | 1 | "one or more apparatuses digitizes and stores audio, and the stored audio is then used to identify a caller at said institution" | "at least one set of equipment converts audible sound from analog signals into a digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" |
| "one or more apparatuses digitizes audio regarding said conversation and | 7, 20 | "one or more apparatuses digitizes and stores audio regarding said conversation; and the | "at least one set of equipment converts audible sound concerning said conversation from analog signals into a |

---

[2] Other claims of the '021 patent recite a gateway that can "include[] routing means," *id.* 20:4-5 (cl. 11), but the fact that the routing means can be part of a gateway does not mean that the gateway itself *is* the routing means.

| | | | |
|---|---|---|---|
| stores said audio for caller identification at said institution" | | stored audio is then used to identify a caller at said institution" | digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" |
| "central platform digitizes audio regarding said conversation and stores said audio for caller identification at an institution associated with said local user" | 16 | "central platform digitizes audio regarding said conversation and stores said audio, and the stored audio is then used to identify a caller at an institution associated with said caller" | "central platform converts audible sound concerning said conversation from analog signals into a digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" |

Several claims of the '021 patent recite one or more components of the central platform (or, in some claims, on-site platform) that digitize audio from inmates' telephone conversations and store the audio "for caller identification at [an] institution."  GTL's proposed constructions track that claim language, explaining that the audio is digitized and stored, then "used to identify a caller at [the] institution."  Securus's constructions, on the other hand, first complicate the claim language unnecessarily, changing "digitize" to "convert[] audible sound from analog signals into a digital format."  Securus then proposes to rewrite the claim language.  The claims recite components that store audio for caller identification at an institution.  Securus wants them to recite components that store audio *at an institution* for caller identification.  But they do not.

In each case, the words "at said institution" unambiguously modify "caller identification," not "stores said audio."  Moreover, that is the only reading that makes sense for those claims that recite a "central platform," one distinguishing feature of which is that it can be located off-site.  *See* '021 patent 17:53-56.  In claim 1, for instance, the entire central platform, including the components that digitize and store audio from telephone conversations, is located "offsite from [the] institution." *Id.* 18:59-60.  It would make little sense to digitize the audio offsite, then send it back to the institution for storage.

Securus's proposed construction is also contrary to the patent specification, in which the preferred embodiment stores both call audio and audio related to calls at an offsite central platform, not at the institution. *See id.* 16:40-56 (describing "preferred" arrangement where audio is stored at central platform **101**, which, as depicted in Figure 1, is located remotely from sites **107***a-n*). "A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct.'" *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Securus's proposal is no exception. Securus's unsupported construction appears to be aimed at broadening the claims in order to make them more susceptible to attack using prior art that discloses storing audio but not using it for caller identification, which is a key feature of the current patent. Securus's self-serving construction should be rejected.

3. *"coupled to"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "coupled to" | 1, 7 | No construction required.<br><br>To the extent the Court believes construction is required: "connected to" | "permanently connected directly to" |

Securus proposes the same flawed construction of "coupled to" for the '021 patent as it did for the '732 patent. Securus's construction is wrong for the same reasons discussed above. *See supra* pp. 6-7. Nothing in the '021 patent suggests that "coupled to" should be interpreted, contrary to its ordinary meaning, to require a direct and permanent connection. Indeed, Securus itself appears to recognize that ordinary meaning; in a recently filed IPR petition challenging the '021 patent, Securus described two elements that were *indirectly* connected as "coupled to" each other. *See* App. 7 (describing telephone terminals and data network facilities as "coupled to"

each other, despite the connection passing through at least a gateway device).

> 4. *"further wherein said central platform comprises one or more apparatuses for processing said telephone call"; "further wherein said central platform includes one or more apparatuses for-processing said telephone call"; and "a central platform for processing said telephone call"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "further wherein said central platform comprises one or more apparatuses for processing said telephone call"<br><br>"further wherein said central platform includes one or more apparatuses for-processing said telephone call"<br><br>"a central platform for processing said telephone call" | 1, 7, 16 | No construction required.<br><br>If the Court construes "central platform" to be subject to 35 U.S.C. § 112(f), GTL identifies the function and corresponding structures as follows:<br><br>Function: "processing telephone calls"<br><br>Corresponding Structure: "central call management platform 101 in Figures 1 & 3; platform 102 in Figure 2; or platform 219 in Figure 4" | Securus contends that this claim term is governed by 35 U.S.C. § 112(f) as it is written in a means-plus- function format, because the terms "central platform" and "apparatuses" do not recite structure and should, therefore, be read as "means," and that the claim limitation should be construed as follows:<br><br>Function: "for processing a telephone call made by said telephone terminal"<br><br>Corresponding Structure: [Securus proposes a sixteen-part corresponding structure for these claim terms that is not practicable to replicate here. The full proposed construction is set out at Appendix pp. 1-4.] |

Each independent claim of the '021 patent recites "a central platform . . . for processing [said] telephone call." Claims 1 and 7 further specify that this central platform consists of one or more apparatuses. The claims also recite the capabilities of the central platform, such as authenticating callers and recording telephone conversations.

The "central platform" terms do not use the word "means"; therefore, there is a "strong presumption" against applying § 112(f) to those terms. *Apple*, 757 F.3d at 1297. Securus

nonetheless proposes to do so.  But Securus cannot overcome the strong presumption and show

that the claims are purely functional.  The Federal Circuit has held that the presumption is not

overcome when, for example, the specification describes the "internal components" of the

limitation and shows how those components are connected together and to other structures.

*Inventio*, 649 F.3d at 1358.  The '021 patent does exactly that.  For example, the specification

describes the platform as having "an integrated channel bank, allowing for fully integrated T-1

capability" which enables calls to be processed over either "analog or digital trunks."  '021

patent 9:54-57.  It specifies that "[t]he architecture of the platform allows it to accommodate

multiple processors," and that it "may include a site server [which] serves as the main database

for the telephone management system [and] also digitizes all information for the digital T-1

trunk."  *Id.* 9:57-66.  These descriptions of the hardware components and configuration of the

central platform contradict Securus's attempt to characterize that term as purely functional.

Even if the "central platform" terms were subject to § 112(f), however, Securus's

construction of them would be improper.  The parties essentially agree on the function:

processing telephone calls (although Securus would limit the claim to calls "made by said

telephone terminal," thus improperly excluding calls received by that telephone).  But while

GTL proposes a corresponding structure based on the figures of the patent that would actually

aid the jury in understanding the nature of a "central platform," Securus proposes a complicated,

sixteen-part construction that pulls several highly specific aspects of various embodiments

described in the specification and tries to turn them into requirements of the claims.  Securus's

proposed construction would require the central platform to include hardware and software for

performing several functions never mentioned in the claims—such as "performing voice

prompts" and "responding to . . . menu selections."  This is improper.  Under § 112(f), "a court

may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger*, 239 F.3d at 1233; *see also Omega Eng'g*, 334 F.3d at 1329.  Most of the sixteen elements in Securus's proposed structure are not necessary to perform the claimed function of processing telephone calls.

It is not reasonable to expect a jury to apply a sixteen-part claim construction in place of a straightforward term that does not even amount to sixteen words.  "Claim construction is not intended to allow for needless substitution of more complicated language for terms easily understood by a lay jury." *Encap LLC v. Oldcastle Retail Inc.*, No. 11-C-808, 2012 WL 2339095, at *9 (E.D. Wis. June 19, 2012).  The Court should reject Securus's construction.

  5.  *"wherein said local user is only granted access to place a telephone call if an authentication means verifies identification information as indicative of a valid user"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "wherein said local user is only granted access to place a telephone call if an authentication means verifies identification information as indicative of a valid user" | 13 | No construction required.<br><br>If the Court construes this phrase to be subject to 35 U.S.C. § 112(f), GTL identifies the function and corresponding structures as follows:<br><br>Function: "Verifying identification information as indicative of a valid user"<br><br>Structure: "a biometric sensor and/or RFID | Securus contends that this claim term is governed by 35 U.S.C. § 112(f) and that the claim limitation should be construed as follows:<br><br>Function: "for verifying identification information as indicative of a valid user"<br><br>Corresponding Structure:<br>1. Institution-assigned inmate specific debit card requiring specific authorization data, the use of biometric recognition device and the use of radio frequency identification devices (Specification, Col. 9:36-43; 13:32-40);<br>2. User-specific personal identification number ("PIN") and information entered by the user of comparison with information stored in a database for that specific user (Specification, Col. 11:10- |

| | | technology and/or a PIN"[3] | 12);<br>3. PIN and biometric data comprising voiceprints, facial architecture, signature architecture, fingerprints, thumbprints, retinal prints, hand geometry and infrared face pattern, scanned, converted and stored in a database (Specification, Col. 11:50–12:3); or<br>4. An active, passive, or neutral radio frequency ("RF") band attached to the user's ankle or wrist, comprising a transponder; a series of sensors for detecting an RF pulse and relaying detection data to a remote or central database containing a processor that calculates the location of the wearer by one of two methods: first, by triangulating the user's source using two or more sensors on a rotating platform; second, by analyzing the time of flight of the emitted RF pulse (Specification, Col. 12:26–13:31). |
|---|---|---|---|

Claim 13 of the '021 patent recites the call processing system of independent claim 7 with the further limitation that a "local user is only granted access to place a telephone call if an authentication means verifies identification information as indicative of a valid user." '021 patent 20:8-11.  GTL does not believe any construction is required for this phrase, but Securus argues that it is governed by § 112(f).  If that statute does apply, the parties agree on the function of the limitation:  verifying identification information as indicative of a valid user.  The dispute is over the structure that performs that function.

GTL's proposal derives from the patent itself, which explains that a caller's identity is verified based on biometric information or RFID technology or a personal identification number (PIN).  *See* '021 patent 11:7-12:8, 12:15-31.  For example, the authentication means may include a thumbprint-scanning device (*id.* 12:1-5) or an RF sensor that can recognize an RF pulse

---

[3] In the Joint Claim Construction statement, GTL's proposed structure was "a biometric sensor and/or RFID technology."  The words "and/or a PIN" were added here after further review of the intrinsic evidence.

emitted by a band worn by the user (*id.* 12:32-38).  GTL originally excluded PINs from its proposed corresponding structure because the specification describes problems with PINs in the prior art.  *See id.* 2:43-3:19.  Nevertheless, the specification describes PINs as an authentication means in "one embodiment" of the invention.  *See id.* 11:7-20.

Securus generally agrees that these structures are permissible, but it wants to limit them to certain highly specific examples provided in the patent, such as a detailed description of a particular RFID arrangement or a long list of sensors for particular biometric data in combination with one or more other means (such as a PIN).  That is not necessary.  As noted above, § 112(f) does not allow a construing court to import structures from the written description into the claims if they are not necessary to perform the relevant function.  *See Wenger*, 239 F.3d at 1233.  The patent describes caller authentication using biometric sensors, RFID technology, or a PIN.  No further limitations on those structures are appropriate.

### C.       The '243 and '736 Patents

The '243 patent and its continuation-in-part, the '736 patent, both provide inventive ways to deal with issues important to prisons:  restricting access to a telephone system and verifying the identity of the participants to a telephone call.  The '736 patent adds another key element:  detecting whether an unauthorized third party has joined a telephone conversation.

1.   *"voice print"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "voice print" | 1 ('243 patent)<br><br>1, 12, 23 ('736 patent) | "voice characteristic information obtained by recording specific words spoken by a user" | "biometric identification made by electronically recording and graphically representing a person's voice" |

In the '243 and '736 patents, a "voice print" is information about the characteristics of the voice of a participant to a telephone call—either the inmate, the called party, or both—that is obtained by having the participant speak particular words, such as his or her name, and recording that information for later use in authentication.  Claim 1 of the '736 patent, for example, recites storing a voice print and later comparing audio of a telephone call to match multiple voice characteristics—pitch, loudness, frequency, or timbre—against the stored voice print.  '736 patent 52:44-61 (cl. 1).  The specifications likewise describe authenticating the identity of call participants "by analyzing a characteristic of the voice data" on the call and comparing it to the same characteristic "of the stored voiceprints" for those individuals.  *Id.* 52:9-16; *see also* '243 patent 5:30-36 (describing "voiceprints" as one example of "sources which constitute unique physiological characteristics and which can assist in establishing a person's identity"); *id.* 12:31-45 (describing voice authentication requiring called party to state a "pre-recorded phrase").

Securus's construction differs from GTL's in two key ways.  First, Securus substitutes the term "biometric identification" for the term "voice print."  This construction will not help lay jurors, who can easily understand the term "voice print" by reference to analogies such as fingerprints, but who are not likely to be familiar with the more technical term "biometric identification."  It should therefore be rejected.  *See, e.g.*, *U.S. Gypsum Co. v. LaFarge N. Am. Inc.*, No. 03-C-6027, 2009 WL 3720032, at *11 (N.D. Ill. Nov. 2, 2009) (rejecting construction that would replace claim language "uniformly" with the "more technical" term "homogeneity").

Second, Securus describes a "voice print" as "graphically representing a person's voice." The concept of a voice print as a "graphical" representation finds no support in the claim language, the specification, or the prosecution history.  A "graphical" representation implies information presented in visual form.  The patents, by contrast, repeatedly describe a voice print

in terms of its audio characteristics.  Claim 1 of the '736 patent, for example, recites comparing

the "audio information" obtained in a call to a stored voice print.  '736 patent 52:49 (cl. 1).

Comparing audio information to a graphical representation would not make sense.  The '243

patent, in portions of the specification that also appear in the '736 patent, describes both the

voice print recording process and the later authentication process using tools for audio

representation (specifically, digitization of analog audio) and analysis, not graphical

representation and visual analysis.  *See, e.g.*, '243 patent 23:6-7 ("[p]rocessed voice signals are

digitized and stored in memory"), 29:38-41 ("Audio record/playback logic **425** supports

recording of the user's name and the called party's name for later use in voice prompts and/or

voice authentication functions."), 30:41-44 (describing use of "coder/decoder" to perform

digital/analog conversion of "audio signals" for "voice recording, biometric authentication, and

the like"), 33:54-55 ("[d]igitized voice files" are used "as voice authentication"), 34:12-13

("Voice processor circuits **811** code user voice signals into digitized voice files for recording and

use for authentication.").  And the '736 patent specification further describes analyzing "average

value[s]" of different vocal characteristics to perform voice authentication, a process that

involves numerical calculations based on audio data, not visual comparison of a "graphically

represent[ed]" voice.  '736 patent 52:9-27.

Securus's sole support for its "graphically representing" construction comes from non-

technical dictionaries.  *See* Dkt. No. 81-2, at 121-23, 160-62.[4]  But the Federal Circuit has

cautioned against relying on such definitions: "[b]y design, general dictionaries collect the

---

[4] Securus pretends that the first of its cited definitions actually comes from "Maxwellbiometrics.com," making it
appear to have a technical source.  In fact, the definition comes from a non-technical website called
"AudioEnglish.org."  *See* SEC_GTLv.SEC105539.  The printed copy of the webpage included in Securus's exhibits
contains a banner advertisement for Maxwell Biometrics, a company in the biometric field.  *See id.*  But the
insertion of that advertisement on the AudioEnglish.org website does not associate the definition with a legitimate
technical source.

definitions of a term as used not only in a particular art field, but in many different settings."

*Phillips*, 415 F.3d at 1321.  In contrast to the general-purpose definitions cited by Securus, the

telecommunications dictionary cited by both parties does *not* define a "voice print" as a graphical

representation.  *See* Dkt. No. 81-2, at 121-22 & Dkt. No. 81-3, at 109 (citing *Newton's Telecom*

*Dictionary* definition of "voiceprint" as "a speech template used to recognize and verify

callers").  This definition comports with the intrinsic evidence and counsels against limiting

voice prints to graphical representations.

> 2.   *"matching said first and second identification numbers" and "if said second voice print matches said first voice print"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "matching said first and second identification numbers" | 1 ('243 patent) | No construction required | "determining that the second identification number is the same as the first identification number" |
| "if said second voice print matches said first voice print" | 1 ('243 patent) | No construction required.<br><br>To the extent the Court believes construction is required: "if said second voice print is from the same individual as said first voice print" | "if said second voiceprint is the same as said first voiceprint" |

A jury does not need to be told what it means to "match" two things.  As court after court

has held, the word "match" has a plain and ordinary meaning that is easily understood.  *See, e.g.*,

*Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, No. 1:05-CV-00955, 2011 WL

6934603, at *10 (M.D.N.C. Dec. 30, 2011) ("There is no evidence that the patentees intended for

'storing', 'matching', and 'transferring' to be given anything other that [*sic*] than their ordinary

meaning."); *Adv. Software Design Corp. v. Fiserv, Inc.*, 625 F. Supp. 2d 815, 826 (E.D. Mo.

2008) ("'Match' has its plain and ordinary meaning."); *Carl Zeiss Vision Int'l GmbH v. Signet*

*Armorlite, Inc.*, No. 07-cv-0894, 2008 WL 4951984, at *6 (S.D. Cal. June 2, 2008) (rejecting

proposed constructions and finding "that one of ordinary skill in the art . . . would construe the

term 'matching' according to its plain and ordinary meaning"); *Konami Corp. v. Roxor Games,

Inc.*, 445 F. Supp. 2d 725, 735 (E.D. Tex. 2006) ("[T]he Court finds that no construction is

necessary because a proper understanding of 'matching relationship' may be reached from a

plain reading of the term in context of the surrounding claim language."). Nothing about the

'243 patent requires a construction of the claims terms requiring "matching."

      If the Court were to construe those terms, though, it should reject Securus's attempt to

impose a requirement that the two things being matched—identification numbers in one claim

element and voice prints in the other—must be completely identical in order to be a "match."

Securus wants to say that the second voice print must be "the same as" the first in order for the

two to "match." But, in the case of voice prints, this requirement of exact identity contradicts the

specification. For example, the '243 patent describes in detail the process of comparing a

different type of biometric information—thumbprints—to determine if there has been "a positive

match." '243 patent 12:18-30. Plainly, two thumbprints taken at different times from the same

individual need not be precisely identical in order to match; the person might orient the thumb in

a different way or apply a different amount of pressure, causing the two print samples to differ

slightly. But the authentication system described in the '243 patent can nonetheless determine

that the two prints are a match. Likewise, for voice prints, the '243 patent describes how data

from the sample taken during a call must be "in compliance with the [pre-recorded] information

in the database *to within some pre-assigned statistical threshold*." *Id.* 12:40-44 (emphasis

added). As with thumbprints, the patent recognizes that two voice prints can be a "match" even

if there is some slight variation between them. Securus's proposed construction runs contrary to

this description in the patent.

Securus's proposal suffers from the same flaw as the construction of "matching" rejected in *Bd. of Regents of the Univ. of Tex. Sys. v. BenQ Am. Corp.*, No. A-05-CA-181-SS, 2006 WL 6112210, at *19-20 (W.D. Tex. July 14, 2006).   There, the defendants argued that "matching said binary code with one or more pre-programmed codes" required the two codes to be identical. The court disagreed, noting that "in everyday usage, ordinary speakers of English often use the term 'match' to describe a simple correspondence rather than an exact identity of items." *Id.* Furthermore, the patent's preferred embodiment did not "contemplate[] an exact identity" between the two codes; therefore, the court held that "it makes no sense to construe the 'matching' step to require an exact identity of items." *Id.* at *20.   The same is true here.  *See also, e.g.*, *Smith v. United States*, 114 Fed. Cl. 428, 435 (Ct. Cl. 2013) (rejecting construction of "match" that would "require[] the two sets of locational data to describe an identical position" as "not supported by the specification").

      3. *"costs of conversations by said local user"*

| Term or Phrase | Claims | GTL's Proposed Construction | Securus's Proposed Construction |
|---|---|---|---|
| "costs of conversations by said local user" | 31 ('736 patent) | "how much said local user pays for the call" | No construction required: plain and ordinary meaning.<br><br>Alternatively, if construction is required: "the amounts charged for telephone calls" |

Dependent claim 31 of the '736 patent recites a computer-readable storage medium with instructions for performing the operations described in independent claim 23 as well as the additional operation of "maintaining information regarding costs of conversations by [a] local user." '736 patent 55:8-10.   GTL proposes to construe those "costs" as "how much said local user pays for the call."   Securus disputes that any construction is necessary but argues that, if

construed, the term should mean "the amounts charged for telephone calls."  The parties thus agree that, in the context of this claims, the phrase "costs of conversations by said local user" refers to the amount that the local user has to pay (or is charged) for the calls—and not, for example, the costs incurred by the phone company in providing the service.

Despite the parties' basic agreement on which "costs" are at issue, Securus's proposed construction reads out the portion of the claim language that limits the cost information being maintained to those calls "by said local user."  Securus's broader construction would encompass a system that tracked cost information collectively, rather than on a user-by-user basis.  That is contrary not only to the claim language but also to the purpose of the invention.  The '736 patent explains that, "[i]n order for a system to be cost effective, the system must critically monitor and record the activities *of each individual user* to properly charge *each individual caller* for his or her outgoing calls."  2:25-28 (emphases added); *see also id.* 11:12-20 (describing "[a]n additional feature of the software" that "can create a debit account for each user and monitors the balance"), 51:8-18 (describing a "commissary workstation" that can record information including "the amount spent on collect calls by each inmate, amount spent on debit calls, the total net financial transactions for each user, etc.").  Securus's proffered construction does not account for that feature of the claimed system and should therefore be rejected.  *See, e.g.*, *Osram GmbH v. ITC*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (reversing claim construction that was "contrary to the ordinary meaning of the term as reflected in the specification . . . and at odds with the purposes of the invention").

## IV.  Conclusion

The Court should adopt GTL's proposed claim constructions.

Dated: November 19, 2014

Respectfully submitted,

*/s/ J.C. Rozendaal*
J.C. Rozendaal (*pro hac vice*)
Courtney S. Elwood (*pro hac vice*)
Evan T. Leo (*pro hac vice*)
Christopher C. Funk (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

E. Leon Carter
Texas State Bar No. 03914300
lcarter@carterscholer.com
John Steven Torkelson
Texas State Bar No. 00795154
jtorkelson@carterscholer.com
Sheria D. Smith
Texas State Bar No. 24075097
ssmith@carterscholer.com
CARTER SCHOLER ARNETT
   HAMADA & MOCKLER PLLC
8150 N Central Expressway
Fifth Floor
Dallas, TX 75206
Tel: (214) 550-8188
Fax: (214) 550-8185

*Counsel for Plaintiff Global Tel\*Link
Corporation*

## CERTIFICATE OF SERVICE

   I hereby certify that on November 19, 2014, Plaintiff electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send certification of such filing to all counsel of record.

*/s/ J.C. Rozendaal*