# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **GLOBAL TEL*LINK CORPORATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civ. Action No. 3:14-cv-0829-K** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **SECURUS TECHNOLOGIES, INC.** | § | |
| | § | **ECF** |
| **Defendant.** | § | |
| | § | |
| | § | |
| | § | |

---

## DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF

---

**G. Michael Gruber**
State Bar No. 08555400
mgruber@ghjhlaw.com
**Anthony J. Magee**
State Bar No. 00786081
amagee@ghjhlaw.com
**Robert E. Weitzel**
State Bar No. 24070823
rweitzel@ghjhlaw.com
**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: 214-855-6800
Fax: 214-855-6808

*Attorneys for Defendant*
*Securus Technologies, Inc.*

TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    CLAIM CONSTRUCTION PRINCIPLES .................................................................1

III.   CONSTRUCTION OF DISPUTED TERMS ...............................................................3

       A.    U.S. Patent No. 7,751,732.................................................................3

             1.    "streaming converter" (Claims 8, 10, and 15) ...................... 3

             2.    "a first telephone instrument. . . configured for communications
                   with a second telephone instrument located at a second location"
                   (Claims 1, 8, and 20).................................................................. 5

             3.    "coupled to" (Claims 1, 5, 6, 8, 15, 20, 22, and 23) ...................... 6

             4.    "coupled between" (Claim 2) ...................................................... 6

             5.    "selectively coupled to" (Claim 10) ................................................ 6

             6.    "a workstation . . . configured to access recorded inmate
                   conversation data stored in said device" (Claims 4 and 23)........... 8

             7.    "ongoing conversation," "ongoing conversations" (Claims 6 and
                   10)................................................................................................ 10

       B.    U.S. Patent No. 7,783,021.................................................................12

             1.    "routing means" (Claim 1)......................................................... 12

             2.    "at least one routing means coupled to said telephone terminal and
                   said central platform" .............................................................. 12

             3.    "one or more apparatuses digitizes audio and stores said audio for
                   caller identification at said institution" (Claim 1) ......................... 14

             4.    "one or more apparatuses digitizes audio regarding said
                   conversation and stores said audio for caller identification at said
                   institution" (Claims 7 and 20)........................................................ 14

             5.    "central platform digitizes audio regarding said conversation and
                   stores said audio for caller identification at an institution associated
                   with said local user" (Claim 16) ................................................ 15

             6.    "coupled to" (Claims 1 and 7) ...................................................... 16

             7.    "further wherein said central platform comprises one or more
                   apparatuses for processing said telephone call," (Claim 1)........... 17

                   "further wherein said central platform includes one or more
                   apparatuses for-processing said telephone call" (Claim 7)........... 17

             8.    "a central platform for processing said telephone call" (Claim 16) .............. 18

9. "wherein said local user is only granted access to place a telephone call if an authentication means verifies identification information as indicative of a valid user" .......................................................... 19

C. U.S. Patent No. 7,853,243 .......................................................................21

    1. "matching said first and second identification numbers" (Claim 1).............. 21

    2. "voice print" (Claim 1) ................................................................. 22

    3. "if said second voiceprint matches said first voice print" (Claim 1)............. 23

D. U.S. Patent No. 8,509,736 ........................................................................24

    1. "voiceprint" (Claims 1, 12, and 23)................................................. 24

    2. "costs of conversations by said local user" (Claim 31) ................................ 25

IV. CONCLUSION....................................................................................................25

INDEX OF AUTHORITIES

## Cases

*800 Adept, Inc. v. AT&T Mobility, LLC*,
   Nos. 5:07CV23, 2008 WL 4831093, at *11, 35–36 (E.D. Tex. July 23, 2008) ...................... 13

*Acacia Media Technologies Corp. v. New Destiny Internet Group*,
   No. SA CV 02–1040–JW, 2004 WL 5645597, at *12 (C.D. Cal. July 12, 2004).................... 7

*Biomedical Polymers, Inc. v. Evergreen Industries, Inc.*,
   976 F.Supp. 98 (D. Mass. 1997)............................................................................ 7, 8

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   296 F.3d 1106 (Fed. Cir. 2002) ....................................................... 2, 3, 19, 20, 21

*Data Race, Inc. v. Lucent Technologies, Inc.*,
   73 F.Supp.2d 698 (W.D. Tex. 1999). ........................................................................ 7

*Embrex, Inc. v. Service Eng'g Corp.*,
   216 F.3d 1343 (Fed. Cir. 2000) ......................................................................... 2, 16

*Function Media, L.L.C. v. Google, Inc.*,
   708 F.3d 1310 at 1317 (Fed. Cir. 2013) ................................................................ 14

*In re Aoyama*,
   656 F.3d 1293 (Fed. Cir. 2011) .......................................................................... 2, 3

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) .................................................................. 2, 14, 16

*Mallinckrodt, Inc. v. Masimo Corp.*,
   254 F. Supp. 2d 1140 (C.D. Cal. 2003) ..................................................................... 3

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) .......................... 1

*Mas-Hamilton Grp. v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998) ............................................................................. 18

*Mosaid Technologies, Inc. v. Samsung Electronics Co., Ltd.*,
   Nos. 01-CV-4340, 03-CV-4698, 2004 WL 5646373, at *1 (D.N.J. Mar. 22, 2004)................. 7

*Net MoneyIN, Inc. v. Verisign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ............................................................................. 19

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012) .................................................................... 2, 3, 21

*OPTi Inc. v. Silicon Integrated Sys. Corp.,*
  No. 2:10-CV-279-JRG, 2012 WL 6684691, at *18 (E.D. Tex. Dec. 21, 2012) ...................... 3

*PCTEL, Inc. v. Agere Systems, Inc.,*
  No. C03-02474, 2006 WL 734385, at *5 (N.D. Cal. Mar. 20, 2006) ........................................ 7

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................................................. 2

*Rodime PLC v. Seagate Tech., Inc.,*
  174 F.3d 1294 (Fed. Cir. 1999) ...................................................................................... 13, 20

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
  299 F.3d 1313 (Fed. Cir. 2002) .................................................................................................. 2

*TI Group Automotive Sys. (N.A.), Inc. v. VDO N.A., L.L.C.,*
  375 F.3d 1126 (Fed. Cir. 2004) .............................................................................................. 13

*United States Surgical Corp. v. Ethicon, Inc.,*
  103 F.3d 1554 (Fed. Cir. 1997) .................................................................................................. 2

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) .................................................................................................... 2

*York Prods., Inc. v. Central Tractor,*
  99 F.3d 1568, 1574 (Fed. Cir. 1996). ........................................................................... 13, 20

## Statutes

35 U.S.C. § 112, ¶ 6 .............................................................................. 14, 17, 18, 19, 20

## Other Authorities

*Collins English Dictionary – Complete and Unabridged (1991-2003)* ........................................ 24

*Computer Desktop Encyclopedia* ................................................................................................ 10

*Dictionary.com* ............................................................................................................................ 10

*Encyclopedia Britannica* ............................................................................................................ 10

*IEEE 100: The Authoritative Dictionary of IEEE Standard Terms*
  (7th ed. 2000) ............................................................................................................................ 6

*Maxwellbiometrics.com* ............................................................................................................ 23

*Merriam Webster's Collegiate Dictionary Tenth Edition (2002)* ..................... 4, 5, 8, 9, 11, 16, 22

*Newton's Telecom Dictionary 17th Edition (2001)* .................................................. 4, 6, 9, 10, 15

*The American Heritage Dictionary of the English Language 4th Edition (2000)*........................ 23

*Webster's New World College Dictionary Fourth Edition (2002)* ............................................... 22

*Webster's Ninth New Collegiate Dictionary* (1991) ...................................................................... 7

*Webster's Third New International Dictionary* (2002) ................................................................. 11

Pursuant to Amended Miscellaneous Order No. 62, ¶ 4-5(a) and paragraph 10(e) of the Scheduling Order [Dkt. 70], Defendant Securus Technologies, Inc. ("Securus") respectfully submits its opening brief regarding claim construction.

## I. INTRODUCTION

Plaintiff Global Tel*Link Corporation's ("GTL") asserted patents are: U.S. Patent No. 7,551,732 ("Centralized Voice Over IP Recording and Retrieval Method and Apparatus"), filed December 7, 2004 (the "'732 patent"); U.S. Patent No. 7,783,021 ("Digital Telecommunications Call Management and Monitoring System"), filed January 28, 2005 (the "'021 patent"); U.S. Patent No. 8,509,736 ("Telecommunication Call Management and Monitoring System with Voiceprint Verification"), filed November 22, 2010 (the "'736 patent"); and U.S. Patent No. 7,853,243 ("Telecommunication Call Management and Monitoring System"), filed December 17, 2007 (the "'243 patent").

Securus submits this opening brief in support of its proposed constructions for the disputed claim terms. Securus' proposed constructions should be adopted because they clarify, but do not change the scope of, the claims, and are supported by both the intrinsic and extrinsic evidence. Securus' proposed constructions also align with the underlying scope and purposes of the claimed inventions.

## II. CLAIM CONSTRUCTION PRINCIPLES

Claim construction is the means to determine "the meaning and scope of the patent claims asserted to be infringed."[1] "It is a bedrock principle of patent law that the claims of a patent

---

[1] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

define the invention to which the patentee is entitled the right to exclude."[2] "[T]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."[3]

The object of claim construction is "to clarify and when necessary to explain what the patentee covered by the claims."[4] Moreover, "the construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims."[5] "Courts do not rewrite claims; instead, [courts] give effect to the terms chosen by the patentee."[6]

In construing claim language, the court may use extrinsic evidence, such as dictionaries, to inform its construction, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."[7]

"The first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation. . . . The next step . . . is to look to the specification and identify the corresponding structure for that function."[8] "The court must construe the function of means-plus-function limitation to include the limitations contained in the claim language, and only those limitations."[9] "It is improper to narrow the scope of the function beyond the claim language.  It is equally improper to broaden the scope of the claimed function by ignoring clear

---

[2] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotes omitted).
[3] *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).
[4] *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).
[5] *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).
[6] *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).
[7] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 & n.6 (Fed. Cir. 1996).
[8] *In re Aoyama*, 656 F.3d 1293, 1296-97 (Fed. Cir. 2011); *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1324, 1332 (Fed. Cir. 2012).
[9] *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).

limitations in the claim language."[10] "Under [the] second step, structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."[11] "[T]he Court is preliminarily informed by the actual components and structures disclosed in the specification."[12] "[T]he corresponding structure must include all structure that actually performs the recited function."[13]

### III.   CONSTRUCTION OF DISPUTED TERMS

### A.   U.S. Patent No. 7,751,732.

1.  "streaming converter" (Claims 8, 10, and 15)

| Securus' Construction | GTL's Construction |
|---|---|
| "a device that converts compressed voice data on the fly into a standard Windows ".wav" format without waiting for the entire voice data file to download" | "hardware and/or software that converts compressed voice  data into a streaming format" |

In the claim language, the patentee did not clearly explain the function and structure of the "streaming converter," but he did so in the specification, as follows:

> Workstations 170,170′ may be provided with a web based application so that an operator may enter criteria for a search of the central database for recordings meeting such criteria. Upon execution of a query to the stored database 220 of the central data center 110, a list of matching call records is presented to the workstation operator. The operator may select from the matching call records and the call conversation data will be sent back to the requesting workstation 170 or 170′ in a streaming format. At the workstations 170, 170′ a converter is provided that converts the compressed conversation data on the fly into a standard Windows ".wav" format. This transfer method allows for evaluation of the call

---

[10] *Id.* (internal citations omitted).

[11] *In re Aoyama*, 656 F.3d at 1297; *Noah Sys.*, 675 F.3d at 1311-12.

[12] *Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1146-47 (C.D. Cal. 2003).

[13] *Cardiac Pacemakers*, 296 F.3d at 1119; *see also OPTi Inc. v. Silicon Integrated Sys. Corp.*, No. 2:10-CV-279-JRG, 2012 WL 6684691, at *18 (E.D. Tex. Dec. 21, 2012) *adhered to sub nom. OPTi, Inc. v. VIA Technologies, Inc.*, No. 2:10-CV-00279-JRG, 2014 WL 4292084 (E.D. Tex. Aug. 29, 2014).

<u>during the data transfer process, thus removing the delay in waiting for the entire file to download prior to review</u>.[14]

Furthermore, Claim 10 provides that the streaming converter is selectively coupled to the analog to digital output so that an "ongoing conversation may be monitored."[15] Additionally, *Newton's Telecom Dictionary* provides that "streaming" is an Internet term that came about as a label for new functionality that allowed Internet users to view webpages, listen to audio recordings, or watch video recordings before websites are fully loaded and before audio and video files are fully downloaded – rather than waiting to download the entire file or load the website.[16] *Merriam Webster's Collegiate Dictionary* defines "converter" as "a device that accepts data in one form and coverts it to another <analog-digital~>."[17] Accordingly, Securus' proposed construction is supported by the intrinsic and extrinsic evidence.

GTL's proposed construction selectively takes language from the specification, omitting the requirement that data is converted on the fly without waiting for the entire voice data file to download. GTL seeks, thereby, to impermissibly broaden the claim by allowing the conversion to take place at any time, including in the future. Further, GTL's proposed construction deletes the requirement that the compressed voice data be converted into a standard Windows ".wav" format. GTL impermissibly attempts to broaden the scope of the claim by allowing the data to be converted into any format. Therefore, Securus requests that the Court adopt its proposed construction of "streaming converter."

---

[14] '732 patent at 6:39–53, App. at 12 (emphasis added). GTL also identifies this portion of the specification as intrinsic evidence. *See* Joint Claim Construction and Prehearing Statement ("JCCPS"), Ex. C at 1-2 [Dkt. 81-3].

[15] '732 patent at Claim 10, App. at 14.

[16] *See Newton's Telecom Dictionary 17th Edition (2001)* ("*Newton's Telecom*"), App. at 1525.

[17] *See Merriam Webster's Collegiate Dictionary Tenth Edition (2002)* ("*Merriam Webster's*"), App. at 1500.

---

2. "a first telephone instrument. . . configured for communications with a second telephone instrument located at a second location" (Claims 1, 8, and 20)

| Securus' Construction | GTL's Construction |
|---|---|
| "an originating telephony device comprising hardware and software arranged to communicate with a distantly located destination telephony device" | No construction required.<br>To the extent the Court believes construction is required: "a telephone located within a prison that can send and receive voice audio to and from a telephone outside the prison" |

Claim 1 discloses "an audio recording system," Claim 8 discloses "an audio monitoring and recording system," and Claim 20 discloses a "specialized phone system for use in relation to a prison environment, having an audio recording system." Each of these systems is comprised of, among other things, "a first telephone instrument . . . configured for communications with a second telephone instrument located at a second location."[18] GTL argues that the disputed term should be construed merely as a telephone that can send and receive voice audio to an external telephone. GTL impermissibly attempts, thereby, to broaden the scope of these claims. Claims 1, 8, and 20 all require that the first telephone instrument be specifically configured to communicate with a second telephone located remotely from the first telephone. Thus, the first telephone instrument cannot be a simple, unintelligent telephone; rather, it must be comprised of hardware and software uniquely arranged to communicate with that distantly located telephone.

According to *Merriam Webster's*, "configure" means "to set up for operation esp. in a particular way."[19] "Configuration" is defined as "something (as a figure, contour, pattern, or apparatus) that results from a particular arrangement of parts or components."[20] *Newton's Telecom* defines "configuration" as "the hardware and software arrangements that define a computer or telecommunications systems and thus determines what the system will do and how

---

[18] '732 patent at Claim 1, 8, and 20, App. at 13-14.
[19] *See Merriam Webster's*, App. at 1499.
[20] *See Merriam Webster's*, App. at 1499.

well it will do it."[21] GTL's own identification of extrinsic evidence includes the following definition of "configure" from *IEEE 100: The Authoritative Dictionary of IEEE Standard Terms* 217 (7th ed. 2000): "to initialize a device so that it operates in a particular way. For instance, a customer may configure a device so the device never requests data link confirmations, using a varied of mechanisms (e.g., parameters in NVRAM, parameters in ROM, dip switches, or hardware jumpers)."[22] Thus, the intrinsic and extrinsic evidence both support Securus' proposed construction.

3. "coupled to" (Claims 1, 5, 6, 8, 15, 20, 22, and 23)

| Securus' Construction | GTL's Construction |
|---|---|
| "permanently connected directly to" | No construction required. To the extent construction is required: "connected to" |

4. "coupled between" (Claim 2)

| Securus' Construction | GTL's Construction |
|---|---|
| "permanently connected directly to both" | No construction required. To the extent construction is required: "connected between" |

5. "selectively coupled to" (Claim 10)

| Securus' Construction | GTL's Construction |
|---|---|
| "when chosen by workstation operator temporarily connected directly to" | No construction required. To the extent construction is required: "selectively connected to" |

The '732 patent uses some derivation of the term "couple" forty-six (46) times in the claims and specification. In almost every instance, a device is directly and physically connected to another device. For example, in Claim 6, a first telephone instrument is coupled to the input of a digital converter, a storage device is coupled to the output of a digital converter, a streaming converter is coupled to a storage device, and a workstation is coupled to a streaming converter.[23]

---

[21] *See Newton's Telecom*, App. at 1518.
[22] *See* JCCPS, Ex. C at 8 [Dkt. 81-3] and App. at 1551.
[23] *See* '732 patent at Claim 6, App. at 14.

In other instances, a device is connected to another device through some single, intervening medium. For example, in Claim 5, a workstation is coupled to a storage device via a wide area network. [24] Also, in Claim 2, a wide area network is "coupled between" a digital converter and a data storage device.[25]

Courts have routinely held that "couple" means to directly connect. "The term "coupling" or "coupled" refers to the direct connection of two or more circuits or systems in such a way that power or signal information may be transferred from one to the other.[26] "Coupled to" means "directly connected to."[27] "The Court construes the phrase "coupled to" to have its plain and ordinary meaning, which is "directly connected to or attached to."[28] "'Coupled' signifies direct contact between two objects."[29] "'[C]onnected' and 'coupled' mean 'directly united, joined, or linked together.'"[30]

The use of "coupled" in the patent at issue in *Data Race, Inc*. is similar to use of "coupled" in the '732 patent. In that case, although the patent also discussed "coupl[ing] through a communication mechanism or channel," there were numerous other instances in the patent where there were "direct connections" between the elements.[31] Accordingly, the court construed "coupling" or "coupled" to be a "direct connection." *Id*. Likewise, in *Biomedical Polymers, Inc*.,

---

[24] *See id.* at Claim 6, App. at 14; s*ee also id.* at 5:37-63, App. at 12; 6:12-21, App. at 12; 6:22-53, App. at 12; 7:28-53, App. at 13.

[25] *See id.* at Claim 2, App. at 13.

[26] *Data Race, Inc. v. Lucent Technologies, Inc.*, 73 F.Supp.2d 698, 719 (W.D. Tex. 1999).

[27] *PCTEL, Inc. v. Agere Systems, Inc.*, No. C03-02474, 2006 WL 734385, at *5 (N.D. Cal. Mar. 20, 2006).

[28] *Acacia Media Technologies Corp. v. New Destiny Internet Group*, No. SA CV 02–1040–JW, 2004 WL 5645597, at *12 (C.D. Cal. July 12, 2004) (citing *Webster's Ninth New Collegiate Dictionary* 298 (1991) (defining "couple" to mean: to connect for consideration together).

[29] *Biomedical Polymers, Inc. v. Evergreen Industries, Inc.*, 976 F.Supp. 98, 101 (D. Mass. 1997).

[30] *Mosaid Technologies, Inc. v. Samsung Electronics Co., Ltd.*, Nos. 01-CV-4340, 03-CV-4698, 2004 WL 5646373, at *1 (D.N.J. Mar. 22, 2004).

[31] *See Data Race, Inc*., 73 F.Supp.2d at 719-20.

---

the court stated that "'[c]oupled' signifies direct contact between two objects" because the specification and claims of the patent in issue in that case use the word "coupled" multiple times when referring to the direct contact of two objects.[32]

In this case, the claims and specification clearly state that when devices are "coupled to" each other, the devices are directly connected. This is supported by the fact that the patent discusses those instances when devices are coupled together through some medium, or, as in Claim 2, when a medium is "coupled between" two devices.  That is, the medium is coupled to both devices and situated "in the time, space, interval that separates."  *See Merriam Webster's* definition of "between."[33] Accordingly, "coupled" should be construed as "connected directly."

Furthermore, Claim 10 discloses an audio monitoring and recording system wherein a streaming converter may be "selectively coupled" to the output of a digital converter so an ongoing conversation can be monitored.[34] *Merriam Webster's* defines "select, selective, selectively" as "of relating to, or characterized by selection, highly specific in activity or effect."[35] The use of "selectively" in relation to "coupled" in Claim 10 strongly indicates that all the other uses of "coupled" in the claims are intended to be a permanent direct connection.

6. "a workstation . . . configured to access recorded inmate conversation data stored in said device" (Claims 4 and 23)

| Securus' Construction | GTL's Construction |
|---|---|
| "a powerful, high-speed personal computer comprising hardware and software arranged to access recorded inmate conversation data stored in said storage device" | No construction required. |

---

[32] *Biomedical Polymers, Inc. v. Evergreen Industries, Inc.*, 976 F.Supp. at 101.
[33] *See Merriam Webster's*, App. at 1498.
[34] *See* '732 patent at Claim 6, App. at 14.
[35] *See Merriam Webster's*, App. at 1508.

Claim 4 discloses "an audio recording system" and Claim 23 discloses a "specialized phone system." Each of these systems is comprised of, among other things, "a workstation . . . configured to access recorded inmate conversation data stored in said device."[36] Claims 4 and 23 require that the workstation be specifically configured to access recorded inmate conversation data. Thus, the workstation cannot be a simple, dumb terminal; rather, it must be, at least, a powerful, high-speed personal computer comprised of hardware and software uniquely arranged to access inmate conversation data from a particular storage device. As explained above, dictionaries define "configure" to mean that the object is set up or arranged in a specific or particular way. Additionally, the specification describes the capabilities of "workstation" by comparing it to "terminal 210" by stating:

> Within central data center 110, terminal 210 corresponds, in many respects, to an onsite version of workstations 170, 170′ discussed supra in that terminal 210 has at least all the capabilities of the workstations 170, 170′. Terminal 210 is illustratively shown as a personal computer, however, such is purely for illustration as the terminal 210 may be embodied as a personal computer, minicomputer, or mainframe computer with suitable control terminals or in any other form as may be desired or necessary such that, when coupled with other elements including, but not limited to the digital voice/data converter device 230 and storage device 220 at the central data center 110, has the capability to accomplish the desired functions of such as converting, storing, searching, retrieving, and playing back of compressed voice data.[37]

Furthermore, dictionary definitions of "workstation" support Securus' construction. *Merriam Webster's* defines "workstation" as: "a powerful microcomputer used esp. for scientific or engineering work."[38] *Newton's Telecom* states that "in the telecom industry, a workstation is a computer and a telephone on a desk and both attached to a telecom outlet in the wall. The computer industry tends to refer to workstations as high-speed personal computers, such as Sun

---

[36] '732 patent at Claims 4 and 23, App. at 13-14.
[37] *See* '732 patent at 7:35-54, App. at 13.
[38] *See Merriam Webster's*, App. at 1512 (emphasis added).

workstations, which are used for high-powered processing tasks like CAD/CAM engineering, etc. <u>A common PC—like the one you find on my desk—is not usually considered a workstation</u>."[39] *Dictionary.com* defines "workstation" as "a powerful personal computer, often with high-resolution display, used for computer-aided design, electronic publishing, or other graphics-intensive processing."[40] *Encyclopedia Britannica's* definition is "a high-performance computer system that is basically designed for a single user and has advanced graphics capabilities, large storage capacity, and a powerful microprocessor (central processing unit). A workstation is more capable than a personal computer (PC) but is less advanced than a midrange computer (which can manage a large network of peripheral PCs or workstations and handle immense data-processing and reporting tasks)."[41] *Computer Desktop Encyclopedia* defines "workstation" as "<u>a high-performance, single-user computer</u> typically used for graphics. CAD, software development and scientific applications. A workstation may be a RISC-based computer that runs under some version of Unix or Linux, the major vendors being Sun, HP, IBM and SGL. It may also refer to a high-end PC using Intel or AMD CPUs from any PC vendor. In all cases, the term implies a machine with a fast CPU and large amounts of memory and disk that is geared toward the professional user rather than the consumer."[42] Therefore, the intrinsic and extrinsic evidence support Securus' proposed construction.

7.   "ongoing conversation," "ongoing conversations" (Claims 6 and 10)

| Securus' Construction | GTL's Construction |
|---|---|
| "a real-time conversation that is actually in process; "real-time conversations that are actually in process" | No construction required. |

---

[39] *See Newton's Telecom*, App. at 1528 (emphasis added).
[40] *See Dictionary.com*, App. at 1486-87 (emphasis added).
[41] *See Encyclopedia Britannica*, App. at 1492-93 (emphasis added).
[42] *See Computer Desktop Encyclopedia*, App. at 1485 (emphasis added).

Claim 6 discloses an audio recording system comprised of, among other things, a workstation configured to access ongoing conversations, while Claim 10 discloses an audio monitoring and recording system that is comprised of, among other things, a streaming converter coupled to a digital converter whereby an ongoing conversation may be monitored.[43] Both Claims 6 and 10 require access to or monitoring of real-time conversations actually in process (i.e., not recorded conversations).

GTL and Securus provide the same definition of "ongoing" from *Merriam Webster's* – "being actually in process."[44] GTL also provides another definition – "that is actually in process."[45] The specification is replete with differentiations between accessing recorded conversations and monitoring real-time conversations. For example, the specification states:

> Thus there has been described an apparatus and methodology for recording, storing, searching, retrieving, and monitoring telephone conversation voice and related data recorded and stored at locations remote from the origination and/or destination locations of the telephone calls. Moreover the disclosed apparatus and methodology permits searchable access to such conversations from multiple remote locations either as previously recorded data or in real time.[46]

During the prosecution of the '732 patent, the patentee further described the differentiation between ongoing and recorded conversations:

> By providing such remote recording and storage, improved access to recorded information as well as remote real-time access to ongoing conversations is made possible, as has been explained in Applicant's disclosure. Specific attention is directed to Applicant's disclosure at page 14, starting with line 8, and to Applicant's Fig. 1. More specifically, attention is directed to the disclosed operation of workstations 170 and 170', which may both be used to monitor recorded as well as real-time conversations. Further, workstation 170 may be

---

[43] *See* '732 patent at Claim 6, App. at 14, Claim 10, App. at 14.

[44] *See Merriam Webster's*, App. at 1506; JCCPS, Ex. C at 33 [Dkt. 81-3].

[45] *See Webster's Third New International Dictionary* (2002) JCCPS, Ex. C at 33 [Dkt. 81-3] and App. at 1585.

[46] *See* '732 patent at 8:23-29, App. at 13; *see also* 3:13-22, App. at 11; 3:47-59, App. at 11; 6:54-60, App. at 12; and 7:54-8:29, App. at 13.

coupled to Central Data Center 110 by way of a connection through the Internet to monitor either recorded or real-time conversations.[47]

Therefore, Securus requests that the Court construe "ongoing conversation" as "a real-time conversation that is actually in process" and "ongoing conversations" accordingly.

### B. U.S. Patent No. 7,783,021.

1. "routing means" (Claim 1)

| Securus' Construction | GTL's Construction |
|---|---|
| Securus contends that this claim term is governed by 35 U.S.C. § 112, ¶ 6 and should be construed as:<br>Function:<br>"for routing a telephone call from said telephone terminal to said central platform"<br>Corresponding Structure:<br>1. "A router located onsite at an institutional facility, a communication link connecting the router to said telephone terminal, and a communication link connecting the router to said central platform over a PSTN" (Specification, Col. 15:59-16:32; FIG. 1); or<br>2. A gateway located onsite at an institutional facility comprising a router ("gateway router"), and a communication link connecting the gateway router to said telephone terminal, and a communication link connecting the gateway router to said central platform over a VOIP Frame Relay (Specification, Col. 18:1-30; FIG. 3). | "router"<br>If this phrase is subject to 35 U.S.C. § 112, ¶ 6:<br>Function:<br>"routing calls placed by users of the system through the platform to an outgoing trunk"<br>Corresponding Structure:<br>"Routers 121a-n of Figure 1; routing means integrated with Platform 102 of Figure 2; routers 213a-n of Figure 3; or router 221 of Figure 4" |

2. "at least one routing means coupled to said telephone terminal and said central platform" (Claim 1)

| Securus' Construction | GTL's Construction |
|---|---|
| Securus contends that this claim term is governed by 35 U.S.C. § 112, ¶ 6 and that function and corresponding structure should be construed as in Section B.1 above. | "at least one router coupled to said telephone terminal and said central platform"<br>If the phrase is subject to 35 U.S.C. § 112, ¶ 6, function and corresponding structure should be construed as in Section B.1 above. |

---

[47] *See* U.S. Patent Application No. 11/005,816, Response to Office Action (November 8, 2007) at 16, App. at 357.

Claim 1 discloses an inmate telecommunication call processing system comprised of, among other things, "at least one routing means coupled to said telephone terminal and said central platform."[48] Securus contends that the disputed term "routing means" is governed by 35 U.S.C. § 112, ¶ 6. Courts have routinely construed "routing means" as a means-plus-function limitation, subject to interpretation under 35 U.S.C. § 112, ¶ 6.[49] Additionally, in determining whether to apply the limiting effects of Section 112, ¶ 6, the presence of the word "means" in Claim 1 creates a presumption that the inventor used the term to invoke the statutory structures of Section 112, ¶ 6.[50] In this case, the presumption cannot be overcome. Claim 1 states a function for "routing means," that is, routing a telephone call from a telephone terminal to a central platform.[51] However, Claim 1 does not recite sufficient structure to perform the claimed function.[52] Accordingly, "routing means" requires means-plus-function analysis.

Securus proposes that the function for "routing means" be construed as "for routing a telephone call from said telephone terminal to said central platform." Claim 1 requires the routing means to be coupled to both "said telephone terminal" and "said central platform." Hence, it follows that the function of the routing means is routing telephone calls from a telephone terminal to a central platform. GTL's proposal that the function is "routing calls placed by users of the system through the platform to an outgoing trunk" ignores the fact that Claim 1

---

[48] *See* '021 patent at Claim 1, App. at 29-30.

[49] *See TI Group Automotive Sys. (N.A.), Inc. v. VDO N.A., L.L.C.*, 375 F.3d 1126, 1137 (Fed. Cir. 2004); *800 Adept, Inc. v. AT&T Mobility, LLC*, Nos. 5:07CV23, 5:07CV57, 2008 WL 4831093, at *11, 35–36 (E.D. Tex. July 23, 2008).

[50] *See York Prods., Inc. v. Central Tractor*, 99 F.3d 1568, 1574 (Fed. Cir. 1996).

[51] *See* '021 patent at Claim 1, App. at 29-30; *see York Prods., Inc.*, 99 F.3d at 1574; *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

[52] *See* '021 patent at Claim 1, App. at 29-30; *see Rodime PLC*, 174 F.3d at 1302.

does not require the routing means to route calls from the central platform to an outgoing trunk. Accordingly, GTL impermissibly attempts to rewrite the claim.[53]

Section 112, ¶ 6 permits writing of functional claims, but "[t]he trade-off for allowing such claiming is that the <u>specification must contain sufficient descriptive text</u> by which a person of skill in the field of the invention would know and understand what structure corresponds to the means limitation."[54] GTL's identification of proposed structures as various devices or means depicted in the patent's diagrams are vague and do not provide sufficient structural description to satisfy the statutory requirements. In contrast, Securus' proposed structures precisely cite to specific language from the patent's specification. Furthermore, GTL lists router 221 of Figure 4 as a potential structure, thereby repeating GTL's flawed argument that Claim 1 requires a routing means to route calls from the central platform to an outgoing trunk. Because each of the precisely described structures identified by Securus performs the correct claimed function, each is a corresponding structure for the subject means-plus-function limitation.

3. "one or more apparatuses digitizes audio and stores said audio for caller identification at said institution" (Claim 1)

| Securus' Construction | GTL's Construction |
| --- | --- |
| "at least one set of equipment converts audible sound from analog signals into a digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" | "one or more apparatuses digitizes and stores audio, and the stored audio is then used to identify a caller at said institution" |

4. "one or more apparatuses digitizes audio regarding said conversation and stores said audio for caller identification at said institution" (Claims 7 and 20)

| Securus' Construction | GTL's Construction |
| --- | --- |
| "at least one set of equipment converts audible sound concerning said conversation from analog signals into | "one or more apparatuses digitizes and stores audio regarding said |

---

[53] *See K-2 Corp.*, 191 F.3d at 1364.
[54] *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) (citation and quotations omitted) (emphasis added).

| a digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" | conversation; and the stored audio is then used to identify a caller at said institution" |

5. "central platform digitizes audio regarding said conversation and stores said audio for caller identification at an institution associated with said local user" (Claim 16)

| Securus' Construction | GTL's Construction |
|---|---|
| "central platform converts audible sound concerning said conversation from analog signals into a digital format and places said audible sound in a location at said institution for later retrieval and use for caller identification" | "central platform digitizes audio regarding said conversation and stores said audio, and the stored audio is then used to identify a caller at an institution associated with said caller" |

Claims 1, 7, 16, and 20 disclose inmate telecommunications call processing systems and method. In each claim, different devices record conversations between a local user and a remote user.[55] Then, in Claim 1, one or more apparatuses digitize audio and stores said audio to be used later for caller identification.[56] In Claims 7, 16, and 20, one or more devises digitizes audio *regarding* recorded conversations and stores said audio to be used later for caller identification.[57]

These limitations require that the devices digitize *audio* and, separately, store *audio*. Based on a plain reading of these phrases, it cannot be said that the devices digitize audio and then store the digitized product. The digitizing process and the storing process are unrelated. GTL improperly attempts to rewrite the first two phrases by omitting the word "said" to require that the device in Claims 1, 7, and 20 "digitizes and stores audio." Securus' proposed construction is supported by the extrinsic evidence. For example, *Newton's Telecom* defines "digitize" as "converting an analog or continuous signal into a series of ones and zeroes i.e. into a digital format."[58] It defines "voice digitization" as "[t]he conversion of an analog voice signal

---

[55] *See* '021 patent at Claims 1, 7, 16, and 20, App. at 29-31.
[56] *See id.* at Claim 1, App. at 29-30.
[57] *See id.* at Claims 7, 16, and 20, App. at 30-31.
[58] *See Newton's Telecom*, App. at 1521.

into binary (digital) bits for storage or transmission."[59] *Merriam Webster's* defines "digitize" as "to convert (as data or an image) to digital form."[60] Further, it defines "store" as "to place or leave in a location (as a warehouse, library, or computer memory) for preservation or later use or disposal."[61] Nothing in these definitions supports GTL's contention that the claim language does not require storage of audio that has not been digitized.

Therefore, Securus requests that the Court adopt Securus' constructions of these phrases as they explain, but do not rewrite and, thereby change, the scope of Claims 1, 7, 16, and 20.[62]

6. "coupled to" (Claims 1 and 7)

| Securus' Construction | GTL's Construction |
|---|---|
| "permanently connected directly to" | No construction required. To the extent the Court believes construction is required: "connected to" |

Similar to the '732 patent's use of "coupled to" discussed above, the '021 patent uses the term "coupled to" five (5) times in the Claims.[63] In every instance, a device is directly and physically connected to another device. For example, in Claim 7, a network connection is coupled to the central platform.[64]

As discussed above in relation to the '732 patent, courts routinely state that "couple" means to directly connect. In this case, the claims clearly indicate that when devices are "coupled to" each other, they are directly connected. Furthermore, there is nothing in the claims, specification, or prosecution history to imply that these connections are temporary or selective.

---

[59] *See Newton's Telecom*, App. at 1526.
[60] *See Merriam Webster's*, App. at 1504.
[61] *See Merriam Webster's*, App. at 1509.
[62] *See Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d at 1347; *K-2 Corp.*,191 F.3d at 1364.
[63] *See* '021 patent at Claims 1, 7, and 20, App. at 29-31.
[64] *See id.* at Claim 7, App. at 30.

7.  "further wherein said central platform comprises one or more apparatuses for processing said telephone call," (Claim 1)
    "further wherein said central platform includes one or more apparatuses for processing said telephone call" (Claim 7)

| Securus' Construction |
|---|
| Securus contends that these claim terms are governed by 35 U.S.C. § 112, ¶ 6 and should be construed as: <br><br> Function: <br> "for processing a telephone call made by said telephone terminal" <br><br> Corresponding Structure: A fully self-contained, digital centralized telephone call processing platform connected to an institutional facility via a LAN or a WAN and further connected to a PSTN and controlled by software associated with an administrative workstation (Spec., Col. 9:36-38, 16:41- 44, 16:63-65) comprising: <br> 1. Authentic means comprising the structure set forth below with regard to construction of "authentication means" (Spec., Col. 9:46-48); <br> 2. Hardware and software for routing telephone calls (Spec., Col. 9:46-48); <br> 3. Hardware and software for performing voice prompts (Spec., Col. 9:46- 48); <br> 4. Hardware and software for responding to menu selections (Spec., Col. 9:46- 48); <br> 5. An integrated channel bank allowing for fully integrated T-1 capability (Spec., Col. 9:54-56); <br> 6. Multiple processors capable of load sharing (Spec., Col 9:56-60, Col. 16:32-36); <br> 7. A site server serving as main database of the telephone management system connected to a number of administrative and investigative workstations capable of being used to create, edit, and monitor user accounts and telephone calls, including by listening to the outgoing calls in real time or by accessing calls stored on the site server or other storage database (Spec., Col 9:60-62, Col. 10:6-11); <br> 8. A digital audio recorder attached the site server for monitoring, recording, and  storing telephone calls in one or more databases, capable of monitoring multiple telephone lines simultaneously (Spec., Col 9:66-10:5, 16:54-63); <br> 9. User-friendly software utilizing a graphical user interface or other types of OSD capable devices for administering user accounts of the telephone management system, including providing calling restrictions at all levels of operation and creating a debit account for each user and monitoring the balance (Spec., Col. 10:19-23, 57-58); <br> 10. Hardware and software for allowing a called party to select options for rejecting a call and blocking calls from a caller, an institution, or similar calls in the future, including a calling party accessible number list database (Spec., Col. 11:36-40, Col. 15:3-5); <br> 11. A storage database for storing PIN and biometric information of a local user (Spec., Col. 11:50-66); <br> 12. Hardware and software for receiving biometric information scanned and converted to the same format as the information stored in the database and for comparing the scanned biometric information to the information maintained in the storage database (Spec. Col. 11:67-12:8); <br> 13. Voice recognition software for listening for certain keywords or phrases in a telephone conversation (Spec. 13:54-57); <br> 14. Software enabling an operator to listen in on user conversations and record suspicious conversations for future reference (Spec., Col. 13:63-14:3); <br> 15. Third-party call detection software (Spec., Col. 14:5-9); *and* |

| 16. Software for locking the telephone keypad of the local user telephone terminal after connection is made to prevent third-party calling or for allowing the user to press a predetermined number of keys after a connection has been made (Spec., Col. 14:24-30). |
|---|
| GTL's Construction |
| No construction required.<br>If "central platform" is subject to 35 U.S.C. § 112, ¶ 6:<br>Function: "processing telephone calls"<br>Corresponding Structure: "central call management platform 101 in Figures 1 & 3; platform 102 in Figure 2; or platform 219 in Figure 4" |

8. "a central platform for processing said telephone call" (Claim 16)

| Securus' Construction | GTL's Construction |
|---|---|
| Securus contends that this claim term is governed by 35 U.S.C. § 112, ¶ 6 and that function and corresponding structure should be construed as in Section B.7 above. | No construction required.<br>If the phrase is subject to 35 U.S.C. § 112, ¶ 6, function and corresponding structure should be construed as in Section B.7 above. |

Claims 1, 7, and 16 disclose inmate telecommunications call processing systems and method comprised of, among other things, a central platform for processing telephone calls.[65] GTL's primary position that no construction is required should be rejected because these claim terms are governed by 35 U.S.C. § 112, ¶ 6. Claims 1, 7, and 16 are written in a means-plus function format, although the word "means" is not used, because the terms "central platform" and "apparatuses" do not recite structure and should, therefore, be read as "means."[66]

The parties disagree on the proposed construction of the recited function. Securus proposes that the function be "for processing a telephone call made by said telephone terminal." Claims 1, 7 and 16 all define "said telephone call" as a call made from a specific onsite telephone terminal before spelling out the claim limitations at issue here.[67] Accordingly,

---

[65] *See* '021 patent at Claims 1, 7, and 16, App. at 29-30.

[66] Use of the word "means" is not required. *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998).

[67] *See* '021 patent at Claims 1, 7, and 16, App. at 29-30.

Securus' proposed function is faithful to the claims. GTL's proposed function of "processing telephone calls" is too generic, impermissibly broadening the scope of the claim.[68]

GTL's proposed construction does no more than restate the term "central platform" and refer to a few figures in the specification that do not disclose actual structure in any meaningful way, which would make the claim impermissibly indefinite.[69] By contrast, Securus' proposal lists all of the structures, the corresponding hardware and software disclosed in the specification, that are clearly linked to and necessary to perform the function of processing a telephone call made by said telephone. Because each listed item identified by Securus works in concert to perform the correct function, cumulatively, they represent the corresponding structure for the subject means-plus-function limitation. Therefore, Securus' proposal should be adopted.

9. "wherein said local user is only granted access to place a telephone call if an authentication means verifies identification information as indicative of a valid user" (Claim 13)

| Securus' Construction | GTL's Construction |
|---|---|
| Securus contends that this claim terms is governed by 35 U.S.C. § 112, ¶ 6 and should be construed as: <br> Function: "for verifying identification information as indicative of a valid user" <br> Corresponding Structure: <br> 1. Institution-assigned inmate specific debit card requiring specific authorization data, the use of biometric recognition device and the use of radio frequency identification devices (Spec., Col. 9:36-43; 13:32-40); <br> 2. User-specific personal identification number ("PIN") and information entered by the user of comparison with information stored in a database for that specific user (Spec., Col. 11:10- 12); <br> 3. PIN and biometric data comprising voiceprints, facial architecture, signature architecture, fingerprints, thumbprints, | No construction required. <br> If this phrase is subject to 35 U.S.C. § 112, ¶ 6: <br> Function: "Verifying identification information as indicative of a valid user" <br> Corresponding Structure: <br> "a biometric sensor and/or RFID technology" |

---

[68] *See Cardiac Pacemakers*, 296 F.3d at 1113.

[69] *Cf. Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) (Reference to a general purpose computer does not provide sufficient structure for a claim drafted in means-plus function form.)

| | |
|---|---|
| retinal prints, hand geometry and infrared face pattern, scanned, converted and stored in a database (Spec., Col. 11:50–12:3); or<br>4. An active, passive, or neutral radio frequency ("RF") band attached to the user's ankle or wrist, comprising a transponder; a series of sensors for detecting an RF pulse and relaying detection data to a remote or central database containing a processor that calculates the location of the wearer by one of two methods: first, by triangulating the user's source using two or more sensors on a rotating platform; second, by analyzing the time of flight of the emitted RF pulse (Spec., Col. 12:26–13:31). | |

GTL's primary position that no construction is required should be rejected because this claim term is governed by 35 U.S.C. § 112, ¶ 6. In determining whether to apply the limiting effects of section 112, ¶ 6, the presence of the word "means" in Claim 13 creates a presumption that the inventor used the term to invoke the statutory strictures of section 112, ¶ 6.[70] In this case, the presumption cannot be overcome. Claim 13 states the function for "authentication means," that is, verifying identification information as indicative of a valid user.[71] However, Claim 13 does not recite sufficient structure to perform the claimed function.[72] Accordingly, "authentication means" requires means-plus-function analysis.

The parties agree that the function should be construed as "for verifying identification information as indicative of a valid user." The parties only disagree as to the corresponding structure. GTL identifies two structures – biometric sensor or RFID technology. GTL's proposed construction is too generic, and, therefore, too broad, because it is an incomplete description of the corresponding structure as described in the specification.[73] Securus' proposed structure

---

[70] *See York Prods., Inc.*, 99 F.3d at 1574.

[71] *See* '021 patent at Claim 13, App. at 30; *see York Prods., Inc.*, 99 F.3d at 1574; *Rodime PLC*, 174 F.3d at 1302.

[72] *See* '021 patent at Claim 13, App. at 30; *see Rodime PLC*, 174 F.3d at 1302.

[73] *See Cardiac Pacemakers*, 296 F.3d at 1119; *see also OPTi Inc.*, 2012 WL 6684691 at *18.

completely defines the corresponding structure, as described in the specification. Because each of the structures identified by Securus performs the correct claimed function, each is a corresponding structure for the subject means-plus-function limitation.[74] Therefore, the Court should adopt Securus' proposed construction of the corresponding structure.

### C.      U.S. Patent No. 7,853,243.

1.   "matching said first and second identification numbers" (Claim 1)

| Securus' Construction | GTL's Construction |
|---|---|
| "determining that the second identification number is the same as the first identification number" | No construction required |

Claim 1 discloses a method for restricting access to a public telephone network using a telephone call management system comprised of, among other things, the step of matching a pre-assigned user identification number with a number inputted by a user when attempting to make a telephone call.[75] GTL argues that this phrase needs no construction. However, in light of the use of "matches" regarding "voice prints" in Claim 1 (addressed below), clarification is required. The specification states that:

> In one embodiment of the present invention, when a user attempts to access his or her account to place a call, the user may be requested, via voice prompts, to select a voice prompt language and enter a user-specific personal identification number. The information entered by the user is compared with information stored in the database for that specific user. If a corresponding PIN match is not achieved, a verification error may be provided and the system may request a re-entry of the PIN. It is foreseeable that if the second attempt fails to provide a match, the individual may be denied access to the telephone system and an official may be notified."[76]

Thus, in order to access his or her account to place a call, a user must enter the exact identification number that has been pre-assigned and stored in the system database.

---

[74] *Cardiac Pacemakers*, at 1119.

[75] *See* '243 patent at Claim 1, App. at 161.

[76] *See* '243 patent at Col. 11:31-41, App. at 141.

Securus' proposed construction of "match" is supported by extrinsic dictionary definitions. *Webster's New World College Dictionary Fourth Edition (2002)* defines "match" as "a counterpart or facsimile, either of two corresponding things or persons; one of a pair."[77] *Merriam Webster's* defines "match" as "to be the counterpart of" and defines "counterpart" to be "a thing that fits another perfectly, one having the same function or characteristics as another."[78] In this case, in order for the matching step to work, the user identification number entered by the user must be the counterpart or pair of the pre-assigned identification number. It must fit perfectly; that is, it must be the same exact number. Therefore, Securus requests that the Court construe "matching said first and second identification numbers" as "determining that the second identification number is the same as the first identification number."

2. "voice print" (Claim 1)

| Securus' Construction | GTL's Construction |
|---|---|
| "biometric identification made by electronically recording and graphically representing a person's voice" | "voice characteristic information obtained by recording specific words spoken by a user" |

Claim 1 does not specifically describe what constitutes a voice print; however, the specification discusses how biometric information is collected:

> Biometric information includes fingerprints, hand geometry, voiceprints, retinal patterns, iris scans, signatures, infrared facial patterns, and all other sources which constitute unique physiological characteristics and which can assist in establishing a person's identity. <u>Various devices exist which can scan one or more biometric characteristics and digitize the information.</u>"[79]

Furthermore, dictionaries provide insightful definitions of "voice print." Securus' proposed construction reflects the definition of "voiceprint" provided by *Maxwellbiometrics.com*:

---

[77] *See Webster's New World College Dictionary Fourth Edition (2002)*, App. at 1537.
[78] *See Merriam Webster's*, App. at 1505.
[79] *See* '243 patent at 5:20-36 (emphasis added).

"biometric identification by electronically recording and graphically representing a person's voice."[80] *The American Heritage Dictionary of the English Language 4th Edition (2000)* ("*American Heritage*") defines "voice print" as "an electronically recorded graphic representation of a person's voice, uniquely characteristic of the individual speaker."[81] *Collins English Dictionary – Complete and Unabridged (1991-2003)* defines "voiceprint" as "a graphic representation of a person's voice recorded electronically, usually having time plotted along the horizontal axis and the frequency of the speech on the vertical axis."[82] What is clear from all these extrinsic definitions is that the identification of an individual through that person's voice (by a voice print) is made by electronically recording and graphically representing that person's voice. GTL's proposed construction omits the requirement that a "print" of the voice be made.

3.   "if said second voiceprint matches said first voice print" (Claim 1)

| Securus' Construction | GTL's Construction |
|---|---|
| "if said second voice print is the same as said first voiceprint" | No construction required. Alternatively: "if said second voiceprint is from the same individual as said first voiceprint" |

Claim 1 requires two matches for authentication purposes: first, through matching identification numbers; second, through matching voice prints.[83] Prior to attempting to make a telephone call, the system stores a first voice print of a potential caller. Then, when the user attempts to make a telephone call, a second voice print is created. The system compares the first and second voice prints and will allow the user to make a telephone call only if they match (provided that the first and second identification numbers also match).[84] As discussed above

---

[80] *See Maxwellbiometrics.com,* App. at 1494.
[81] *See American Heritage,* App. at 1533.
[82] *See Collins English Dictionary – Complete and Unabridged (1991-2003),* App. at 1533.
[83] *See* '243 patent at Claim 1, App. at 161.
[84] *See id.*

regarding matching user identification numbers, the first and second voiceprints must be identical. By using the term "matches" or "matching" in context of both identification numbers and voice prints, the patentee is making clear that they should be used the same way. The voice print created when the user attempts to place a call must be the counterpart or pair of the first stored voice print.  It must fit perfectly, that is, it must be exactly the same.

GTL argues that this phrase needs no construction. Alternatively, GTL contends that the phrase should be construed as "if second voiceprint is from the same individual as said first voiceprint." The claim does not speak of matching individuals, but rather matching voice prints. Similarly, the specification states that:

> Biometric authentication means may also be implemented to authenticate the called party. In this type of system, the authentication may include one or more biometric authentication means in addition to non-biometric authentication means. In this embodiment, before the called party is allowed to converse with the caller, the called party may be asked to supply voice authentication and/or provide a PIN. This information may be stored in a database either prior to a user's first call or when the first call is made. If the data has been stored prior to the call, the called party <u>would have to state the pre-recorded phrase</u>. The recorded data would then be compared with information in the database.[85]

Thus, both the claim language and the specification preclude GTL's proposed construction. GTL's proposal impermissibly attempts, therefore, to rewrite the claim. Accordingly, Securus requests that the Court construe "if said second voiceprint matches said first voice print" as "if said second voice print is the same as said first voiceprint."

### D.    U.S. Patent No. 8,509,736.

1.   "voiceprint" (Claims 1, 12, and 23)

| Securus' Construction | GTL's Construction |
|---|---|
| "biometric identification made by electronically recording and graphically | "voice characteristic information obtained by recording specific words spoken by a user" |

---

[85] *See* '243 patent at 12:18-47, App. at 141 (emphasis added).

| representing a person's voice" | |
| --- | --- |

For the reasons stated in Section C.2 above, Securus requests that the Court construe "voiceprint" in the same terms as "voice print."

2.   "costs of conversations by said local user" (Claim 31)

| Securus' Construction | GTL's Construction |
| --- | --- |
| No construction required: plain and ordinary meaning. Alternatively, if construction is required: "the amounts charged for telephone calls" | "how much said local user pays for the call" |

This claim requires no construction, but if the Court believes it does, Securus' proposal should be adopted. GTL's proposed construction equates "costs of conversation" to the amount the local user pays for the call, but this construction fails to take into account that what a user pays may not be what is charged for the call. The specification states that "in order for a system to be cost effective, the system must critically monitor and record the activities of each individual user to properly charge each individual caller for his or her outgoing calls."[86]

IV.   **CONCLUSION**

For the foregoing reasons, Securus respectfully requests that the Court adopt all of Securus' proposed claim constructions.

---

[86] *See* '736 patent at 2:25-28, App. at 70.

Respectfully Submitted,


*/s/ Anthony J. Magee*

**G. Michael Gruber**
State Bar No. 08555400
mgruber@ghjhlaw.com
**Anthony J. Magee**
State Bar No. 00786081
amagee@ghjhlaw.com
**Robert E. Weitzel**
State Bar No. 24070823
rweitzel@ghjhlaw.com
**Gruber Hurst Johansen Hail Shank LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: 214-855-6800
Fax: 214-855-6808

*Attorneys for Defendant*
*Securus Technologies, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2014, Defendant electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send certification of such filing to all counsel.

/s/ Robert E. Weitzel
Robert E. Weitzel